**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| **ORANGE COUNTY, INDIANA, ON BEHALF OF ITSELF AND ALL OTHER SIMILARLY SITUATED LOCAL GOVERNMENTAL ENTITIES,**<br><br>        **PLAINTIFFS,**<br>**v.**<br><br>**MCKINSEY & COMPANY, INC.,**<br><br>**MCKINSEY & COMPANY, INC. UNITED STATES, AND**<br><br>**MCKINSEY & COMPANY, INC. WASHINGTON D.C.**<br><br>        **DEFENDANTS.** | **Civil Action No. 4:21-cv-43**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>*Jury Trial Requested* |

# TABLE OF CONTENTS

Preliminary Statement ....................................................................................... 1

Procedural Statement ......................................................................................... 2

Jurisdiction & Venue ......................................................................................... 2

Parties ................................................................................................................ 3

    **A.**    Plaintiffs. .................................................................................... 3

    **B.**    Defendants. ................................................................................. 5

Factual Allegations ............................................................................................ 6

    **A.**    Background. ................................................................................ 6

    **B.**    **Purdue pleads guilty to misbranding OxyContin and is bound by a Corporate Integrity Agreement.** ..................... 12

    **C.**    **Purdue hires McKinsey to boost opioid sales despite the company's guilty plea and Corporate Integrity Agreement.** ... 13

        1.    The Sacklers distance themselves from Purdue. ........................ 14

        2.    Purdue hires McKinsey to devise and implement an OxyContin sales strategy consistent with the Sacklers' goals. ............ 16

    **D.**    **McKinsey does more that provide advice: "Consulting is more than giving advice."** ....................... 19

    **E.**    **Purdue relies on McKinsey.** .................................. 21

        1.    McKinsey's Transformational Relationship. ...................... 22

    **F.**    **McKinsey Delivers.** ............................................... 24

        1.    Granular Growth. .................................................... 24

        2.    "Identifying Granular Growth Opportunities for OxyContin." .... 26

    **G.**    **Transformation: Purdue implements McKinsey's strategies.** ....... 34

        1.    Project Turbocharge ................................................ 36

    **H.**    **McKinsey's efforts triple OxyContin sales.** .................. 39

I.      McKinsey Was Aware of the Devasting Effects of Opioids and Continued to Provide Marketing Advice. .................................................................... 41

J.      McKinsey Continued Consulting to Increase the Sale of Opioids Despite the Nationwide Epidemic. ................................................................................. 46

        1.      Purdue Pleads Guilty—Once Again. ....................................... 50

        2.      McKinsey's public *mea culpa.* ............................................. 51

**Class Allegations** ................................................................................................ 52

        A.      Class Definition. ................................................................................. 52

        B.      Class Requirements. ........................................................................... 53

**Claims for Relief** ................................................................................................ 55

        A.      Negligence. ......................................................................................... 55

        B.      Negligent Misrepresentation. ............................................................. 56

        C.      Public Nuisance. ................................................................................. 56

        D.      Fraud (Actual and Constructive) and Deceit ..................................... 58

        E.      Civil Conspiracy. ............................................................................... 60

        F.      Negligence Per Se. ............................................................................. 61

        G.      Deceptive Advertising. ....................................................................... 62

**Prayer for Relief** ................................................................................................ 63

## PRELIMINARY STATEMENT

1.      Plaintiffs provide essential services for their citizens and residents, including law enforcement, emergency medical assistance, services for families and children, public assistance, public welfare, and other care and services for the health, safety and welfare of their citizens and residents. The rising numbers of people addicted to opioids have led to significantly increased costs, as well as a dramatic increase of social problems, including, but not limited to, drug abuse and the commission of criminal acts to obtain opioids.[1]

2.      Opioids include brand-name drugs like Oxycontin and Percocet, as well as generic drugs like oxycodone and hydrocodone. These drugs are derived from or possess properties similar to opium and heroin, and, as such, they are highly addictive and dangerous.

3.      Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2] The crisis arose from opioid manufacturers' (such as Purdue Pharma) deliberately deceptive marketing strategy to expand opioid use.  Defendants played an integral role in creating and deepening the opioid crisis.

4.      Plaintiffs bring this action to recover damages from Defendants and to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies that has been spent, or will be spent, because of Defendants' conduct in fueling the epidemic. Defendants knew of the dangers of opioids, and of

---

[1]    As used herein, the term "opioid" or "opioids" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2]    *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain— Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

Purdue's prior misconduct, but nonetheless advised Purdue to improperly market and sell OxyContin.

5.     On December 5, 2020, Defendant issued an apology—a *mea culpa*—for its actions that contributed to and worsened the opioid epidemic.

> We recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country…
>
> We recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.[3]

## PROCEDURAL STATEMENT

6.     The headings contained in this Class Action Complaint are intended only to assist in reviewing the statements and allegations contained herein.  To avoid the unnecessary repetition in each section, Plaintiffs affirm and incorporate each paragraph in each section of this Class Action Complaint as though fully set forth therein.

7.     The factual allegations contained in this Class Action Complaint are ***not exhaustive*** and are presented throughout this Class Action Complaint solely to provide the Defendant with the requisite notice of the basis for the Plaintiffs' allegations and claims.  The Plaintiffs expressly reserve the right to plead additional facts where and as necessary to ensure complete relief.

## JURISDICTION & VENUE

8.     Jurisdiction and venue are proper in the Southern District of Indiana.

---

[3]    *https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-purdue-pharma#.*

9.     Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. §
1332(d) as this is a class action, the parties are citizens of different states and the amount in
controversy exceeds $5,000,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Defendants because, at all relevant
times, Defendants have purposely availed themselves to the privilege of doing business in
Indiana, including by engaging in the business of researching, designing, and implementing
marketing and promoting strategies for various opioid manufacturers, including Purdue, in
support of their sales and marketing of opioids in Indiana.  Further, Defendants do business by
agent in Indiana, directly and through the purposeful direction of their actions towards Indiana
and have the requisite minimum contacts with Indiana necessary to constitutionally permit the
exercise of jurisdiction.

11.     Venue is proper in the Southern District of Indiana because a substantial part of
the events or omissions giving rise to the claims occurred in this district, and all other related
claims are also proper in this district as additional claims against the named Defendants.  Further,
Defendants have caused harm to Plaintiffs within this district.

12.     The Court also has supplemental jurisdiction over the Plaintiff's state law claims
pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or
controversy.

## PARTIES

**A.     Plaintiffs.**

13.     The Plaintiffs in this case include local governmental entities that have been
damaged and continue to be damaged by the Defendants' conduct.

14.     Plaintiff **Orange County** is an Indiana local governmental entity located, as its name implies, in Orange County Indiana.  As such, it has all of the express and inherent powers granted by the Constitution and the Laws of  the State of Indiana.

15.     Plaintiffs are responsible for the public health, safety, and welfare of their citizens—as well as the inherent protection of their own budgetary and social expenditures.

16.     In Plaintiffs local communities, opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis, is a public nuisance, and Defendants' actions have caused and contributed to this public nuisance.

17.     Defendants' actions created the foreseeable opioid crisis and public nuisance for which Plaintiffs seek relief.

18.     Plaintiffs have sustained economic damages as a direct and proximate result of Defendants' conduct as alleged herein.  Categories of past and continuing damages include inter alia; (i) costs associated with law enforcement and public safety relating to the opioid epidemic: (ii) costs for providing emergency services, medical care, therapeutic care, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (iii) costs for prescription drug purchases; and (iv) such other costs as may be proven in this litigation.

19.     Orange County brings this action on its behalf, and on behalf of all other Indiana local governmental entities similarly situated—collectively "Plaintiffs."

20.     Plaintiffs seek the means to abate the opioid epidemic created by Defendants' wrongful and/or unlawful conduct.

4

21.    Plaintiffs are authorized by law to abate any nuisance and prosecute any person or entity who creates, continues or contributes to such nuisance, and to prevent injury and annoyance from such nuisance.

22.    Plaintiffs have standing to bring this action and recover damages incurred as a result of Defendants' acts and omissions.

**B.    Defendants.**

23.    Defendant **McKinsey & Company, Inc**. is a corporation organized under the laws of the State of New York, whose principal place of business is located at 711 Third Avenue, New York, NY 10017.

24.    Defendant **McKinsey & Company, Inc. United States** is a foreign corporation with its principal office at 711 Third Avenue, New York, NY 10017.

25.    Defendant **McKinsey & Company, Inc. Washington D.C.** is a corporation organized under the laws of the State of Delaware, whose principal place of business is located at 1200 19th Street, NW, Suite 1100, Washington DC 20036, and at all times relevant hereto was authorized to do business and was doing business in the State of Indiana.

26.    McKinsey & Company, Inc., McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. are referred to collectively as "Defendants" or "McKinsey."

27.    McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has also provided related consulting services to other manufacturers of opioids.

## FACTUAL ALLEGATIONS

**A.     Background.**

28.     On May 10, 2007, John Brownlee, United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P. ("Purdue"), relating to the misbranding of OxyContin. Brownlee stated, "Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market."

29.     Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services. For a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives vis-à-vis their interactions with health care providers.

30.     In the wake of Purdue's accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. The Corporate Integrity Agreement was a problem to solve. Despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

31.     The problem was complex. As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded as an increasingly

dangerous "concentration of risk" for Purdue's owners. Ten days after the guilty plea was

announced, David Sackler wrote to his dad, Richard Sackler, and uncle, Jonathan Sackler,

describing precisely what that "risk" was: legal liability for selling OxyContin. In response to

Jonathan stating that "there is no basis to sue 'the family,'" David replied:

| Message | |
|---|---|
| From: | David Sackler ████████████████ |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan' ████████ ll- Sackler, Dr Richard ████████████ |
| CC: | Ives, Stephen A. ████████████████████ |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

32.     Given concern over this "concentration of risk," the two sides of the Sackler

family spent considerable time and energy debating the best way to achieve distance from Purdue,

and collectively considered a variety of options for doing so. One option was to sell the company

to or merge the company with another pharmaceutical manufacturer. Shire was discussed as a

possible target, as was Cephalon, UCB, and Sepracor, Inc. The proceeds of such a transaction

could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

33.     Another option was to have Purdue borrow money in order to assure Purdue had

adequate funds to continue operating while the Sacklers, as owners, began to make substantial

distributions of money from the company to themselves. Once again, the proceeds of the

distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired

distance.

34.     In order to pursue *either* of these options, the Sacklers needed to maximize opioid

sales *in the short term* so as to make Purdue—by then the subject of substantial public

scrutiny—appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

35.     In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company dependency for good.

36.     Given the complexity of the problem, the Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey, which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

37.     McKinsey accepted their request,[4] and by June 2009 McKinsey and Purdue were working together to increase sales of Purdue's opioids. McKinsey suggested a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey and Purdue then implemented McKinsey's plan. Despite the strictures imposed upon Purdue by the Corporate Integrity Agreement, OxyContin sales began to multiply.

38.     In 2012, Purdue's Corporate Integrity Agreement ended. With its demise, McKinsey's ongoing relationship with Purdue flourished.[5] In 2013, McKinsey proposed, and

---

[4]    This complaint assumes that Purdue asked McKinsey to design and implement the strategy for boosting opioid sales, and McKinsey accepted Purdue's offer. What is known is that McKinsey performed the work for Purdue. For the purposes of this complaint, Plaintiffs and the putative Class assume Purdue initiated the relationship with McKinsey. Should it arise that instead McKinsey pitched a proposal to increase OxyContin sales to Purdue, and Purdue accepted that proposal, then Plaintiffs will amend the complaint where and as necessary.

[5]    McKinsey espouses the idea of the "transformational relationship." It is not a one-off seller of advice for any given CEO's problem of the day. Rather, McKinsey argues that real value for the client derives from an ongoing "transformational" relationship with the firm. Duff McDonald,

Purdue implemented with McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy to increase opioids sales by *hundreds of millions* of dollars annually. Purdue then picked a new name – *Evolve 2 Excellence* – and adopted it as the theme to its 2014 national sales campaign. With McKinsey's assistance, Purdue trained its sales representatives to operate pursuant to McKinsey's strategy for selling OxyContin.

39.     In 2013, despite significant headwinds, OxyContin sales finally peaked. The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales: the guilty plea identified a specific segment of existing OxyContin sales that were illegitimate and should thus cease. All else being equal, OxyContin sales should have decreased to account for the successful snuffing out of improper sales. In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

40.     Within five years, however, OxyContin sales would triple. McKinsey is responsible for the strategy that accomplished this. It presented specific plans to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[6]

41.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis for Purdue.[7] On March 7, 2019, Kevin

---

*The Firm*, Pg. 136-37 (Simon & Schuster 2013) ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970's], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely."). This complaint tells the story of McKinsey's transformational relationship with Purdue.

[6]     On February 10. 2018, Purdue announced that it is no longer marketing opioids, and disbanded its OxyContin sales force.

[7]     *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times, Feb. 1, 2019, available at: *https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opioids.html*.

Sneader, McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny – fair and unfair – will continue. It is the price we pay for being 'in the arena' and working on what matters."[8]

42.    Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated.[9] In addition to its work for Purdue, McKinsey has performed work for "several other companies on opioids."[10]

---

[8]    *See* "*The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Magazine, March 8, 2019, available at: *https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/.* The "arena" reference is to *Citizenship in a Republic*, a speech delivered by Theodore Roosevelt on April 23, 1910: "It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat."

[9]    *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN, May 24, 2019, available at: *https://www.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html.* The statement was attributed to McKinsey as an entity. No individual's name was attributed.

[10]    *See* Drew Armstrong, *McKinsey No Longer Consulting for Purdue, Ends Opioid Work*, Bloomberg, May 23, 2019, available at: *https://www.bloomberg.com/news/articles/2019-05-24/mckinsey- no-longer-working-with-purdue-halts-opioid-consulting.* While Plaintiffs are aware of work McKinsey has performed for other opioid manufacturers, this complaint concerns McKinsey's work with Purdue.

43.     Plaintiffs argue that the price for being in the arena is more than scrutiny, however fair. This complaint asserts that, like any other participant in the arena, McKinsey is liable for its deeds. McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's *mandate* was to increase the sales of the drug *in light of the fact* that Purdue had plead guilty to misbranding, and the owners of Purdue now wished to exit the opioid market due to the perceived reputational risks of remaining there.

44.     McKinsey's task was to thread the needle: to increase OxyContin sales *given the strictures imposed by the 5-year Corporate Integrity Agreement*. This McKinsey did, turbocharging the sales of a drug it knew fully well was addictive and deadly, while paying at least tacit respect to the Corporate Integrity Agreement.[11]

45.     These managerial acrobatics were necessary for Purdue to seem financially attractive enough that a potential buyer would be willing to discount (or even overlook) the otherwise obvious risks associated with purchasing the maker of OxyContin. Purdue was the proverbial hot potato. The Sackler family hired McKinsey to help them hand it to someone else. McKinsey obliged, and devised a successful strategy to purposefully increase the amount of OxyContin sold in the United States. Their efforts *tripled* OxyContin sales.

46.     In the end, of course, the Sacklers never sold Purdue, and no one loaned it money. In time, the full scope of the opioid crisis would be clear not only to experts, insiders, and industry participants. Along with the rest of nation, Plaintiffs are now squarely focused on the crisis.

---

[11]   McKinsey's description of its efforts.

47.     This complaint concerns McKinsey's work for Purdue Pharma and its owner, the Sackler family, beginning at least as early as 2004, and in particular McKinsey's work in the years after the 2007 guilty plea relating to Purdue's sales and marketing strategy for its opioids.

48.     McKinsey had an ongoing relationship with Purdue beginning at least as early as 2004 and lasting decades. By June 2009 McKinsey was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the Corporate Integrity Agreement. McKinsey continued this work after the expiration of the Corporate Integrity Agreement and at least through November of 2017.

**B.    Purdue pleads guilty to misbranding OxyContin and is bound by a Corporate Integrity Agreement.**

49.     On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.*

50.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

51.     Concurrent with the guilty plea by the Purdue Frederick Company, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services on May 7, 2007.

52.     Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

53.     Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

a.      selling, marketing, promoting, advertising, and disseminating Materials or

information about Purdue's products in compliance with all applicable FDA

requirements, including requirements relating to the dissemination of information that is

fair and accurate … including, but not limited to information concerning the withdrawal,

drug tolerance, drug addiction or drug abuse of Purdue's products;

b.      compensation (including salaries and bonuses) for Relevant Covered

Persons engaged in promoting and selling Purdue's products that are designed to ensure

that financial incentives do not inappropriately motivate such individuals to engage in the

improper promotion or sales of Purdue's products; and

c.      the process by which and standards according to which Purdue sales

representatives provide Materials or respond to requests from HCP's [health care

providers] for information about Purdue's products, including information concerning

withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products,"

including "the form and content of Materials disseminated by sales representatives," and

"the internal review process for the Materials and information disseminated by sales

representatives."

54.      Purdue was obligated to engage an Independent Review Organization to ensure its

compliance with the strictures of the Corporate Integrity Agreement, and to file compliance

reports on an annual basis with the inspector general.

**C.      Purdue hires McKinsey to boost opioid sales despite the company's guilty plea and Corporate Integrity Agreement.**

55.      The Sackler family has owned and controlled Purdue and its predecessors since

1952. At all times relevant to this complaint, individual Sackler family members occupied either

six or seven of the seats on Purdue's board of directors, and at all times held a majority of Board

seats. To advise the board of directors of Purdue Pharma was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[12]

### 1.    The Sacklers distance themselves from Purdue.

56.    After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

57.    In the event that a purchaser for Purdue could not be found, Richard stated Purdue should "distribute more free cash flow" to the Sacklers. This would have the effect of maximizing the amount of money an owner could take out of a business and is a tacit acknowledgement that reinvestment of profits in the business was not a sound financial strategy. It is, in other words, an acknowledgement that Purdue's reputation and franchise was irrevocably damaged, and that Purdue's opioid business was not sustainable in the long term.

58.    By 2017, with the hope for any acquisition now gone, the Sacklers' decision to milk opioid profits by "distributing more free cash flow" on the way down had its natural effect

---

[12]    Craig Landau, soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

on Purdue. Craig Landau, then the CEO, stated, "the planned and purposeful de-emphasis and deconstruction of R&D has left the organization unable to innovate."

59.     In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to the owners.[13]

60.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who worked at Purdue stepped back from their operational roles."[14]

61.     In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They remained on the board, however.

62.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals. The Sacklers established Rhodes *four months* after the 2007 guilty plea.[15]

63.     Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue.

---

[13]  *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall Street Journal, June 30, 2019, available at: *https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-1561887120?mod=hp_lead_pos6.*
[14]  Barry Meier, *Pain Killer*, Pg. 167 (Random House 2018).
[15]  *Billionaire Sackler family owns second opioid maker*, Financial Times, September 9, 2018, available at: *https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.*

64.     By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[16]

### 2.     Purdue hires McKinsey to devise and implement an OxyContin sales strategy consistent with the Sacklers' goals.

65.     The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing to comply with the Corporate Integrity Agreement.[17]

66.     Purdue and the Sacklers were well aware of the constraints posed by the Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives."

67.     John Stewart, the Sacklers' chosen Chief Executive Officer for Purdue at the time, saw an opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch fall

---

[16]    *Id.*

[17]    As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'one-two' punch fuelled the market for* opioids, Financial Times, September 9, 2018, available at: *https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.*

outside of the Corporate Integrity Agreement, he asked?[18] It would not, he was told by Bert Weinstein, Purdue's Vice President of Compliance.[19]

68.     Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

69.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[20]

70.     Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the Corporate Integrity Agreement internally, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales in light of the Corporate Integrity Agreement and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

71.     In short, Purdue would pay money to McKinsey in exchange for McKinsey telling the company how to sell as much OxyContin as conceivably possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue.

72.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

---

[18]   Purdue Pharma Executive Committee Meeting Notes and Actions, May 20, 2009, Pg. 2.
[19]   *Id.*
[20]   *How McKinsey Became One of the Most Powerful Companies in the World*, CNBC, June 6, 2019 available at: *https://www.youtube.com/watch?v=BBmmMj_maII.*

73.    Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Mr. Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid over $25 million for his services to Purdue from 2007 through 2013.

74.    Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey.

75.    In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.

76.    Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

77.    McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia, Vice President of Sales and Marketing.

78.    From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the creation of an OxyContin sales strategy, but also its implementation.

**D.    McKinsey does more that provide advice: "Consulting is more than giving advice."**

79.    Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[21]

80.    Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant would provide a plan to the client that the client may choose to adopt or not.

81.    "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

82.    In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work: "The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation

---

[21]    Arthur Turner, *Consulting is More Than Giving Advice*, Harvard Business Review, September 1982, available at: *https://hbr.org/1982/09/consulting-is-more-than-giving-advice.*

solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job."[22]

83.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[23]

84.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided within the "transformational relationship" McKinsey developed with its clients.[24]

85.     Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we work that cohesively together."[25]

---

[22]   *Id.*
[23]   McDonald, *The Firm*, Pg. 308.
[24]   For McKinsey's own description of its implementation services, available at: *https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation* (last accessed October 19, 2020).
[25]   McKinsey on Implementation, April 30, 2017, available at: *https://www.youtube.com/watch?v=rEQOGVpl9CY.*

86.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[26]

87.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

88.     Indeed, long after McKinsey's advice to Purdue was accepted and deployed as the theme of Purdue's 2014 national sales strategy, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

**E.    Purdue relies on McKinsey.**

89.     McKinsey is not hired to give casual advice. They are a corporate mandarin elite, likened to the Marines or the Jesuits.[27]

90.     United States Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of the *Wall Street Journal* that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "So I would have … at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[28]

---

[26]    *Id.*

[27]    Said one former McKinsey partner to *BusinessWeek* in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, *The Firm*, pg. 165.

[28]    McDonald, *The Firm*, pg. 1.

91.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

1.     **McKinsey's Transformational Relationship.**

92.     McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

93.     At its core, the "transformational relationship" is *long-term*. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[29] The long-term result can be "dependence" on the McKinsey consultants.

94.     This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a

---

[29]  *Id.* at pg. 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling and Rob Rosiello regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Craig Landau] to do whatever he thinks is necessary to 'save the business.'… *I believe there is a good opportunity to get another project here."* (emphasis added).  Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

steady and growing flow of billings for years if not decades. In 2002, for example, BusinessWeek noted that at that moment, the firm had served four hundred clients for fifteen years or more.[30]

95.     Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although it is known that McKinsey worked with Purdue for years *before* Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying Corporate Integrity Agreement. The work continued through at least 2018.

96.     McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

97.     McKinsey staffed at least 36 known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea,

---

[30]  *Id.* at pg. 136.

McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

**F.    McKinsey Delivers.**

98.    By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales in light of the Corporate Integrity Agreement and the diminishing outlook for Purdue.

99.    In June 2009, McKinsey advised Purdue senior management, including Craig Landau, then the Chief Medical Officer and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

1.    **Granular Growth.**

100.    McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

101.    After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

102.    In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth and exploiting them for all they are worth. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company*

24

*Performance* (Wiley, April 2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[31]

103.    Previously, in an article in the *McKinsey Quarterly* (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggest that executives should 'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micro markets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[32]

104.    Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[33]

105.    One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discover that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores; then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states.

---

[31]    *The granularity of growth, Book Excerpt, McKinsey & Company,* March 1, 2008, available at: *https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the- granularity-of-growth.*

[32]    Mehrdad Baghai *et. al.*, *The granularity of growth,* McKinsey Quarterly, May 2007, available at: *https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.*

[33]    *Id.*

106.    McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth for the client. Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

**2.      "Identifying Granular Growth Opportunities for OxyContin."**

107.    McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

108.    By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

109.    In June of 2012, John Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

110.    This McKinsey did in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses."

111.    In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreen's locations to encourage the use of Purdue's opioids despite Walgreens actions.

112.    The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

       **a.**      **Marketing – Countering Emotional Messages.**

113.    From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's Chief Medical Officer (and current CEO) Craig Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

114.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

115.    These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

116.    Purdue's marketing materials from that period are illustrative of the approach:[34]



---

[34]    *State of Tennessee v. Purdue Pharma L.P.*, Case No. 1-173-18 (Compl. May 15, 2018) ¶ 24.

117.    In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment *patients* to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

### a.    Targeting – Selling More OxyContin to Existing High Prescribers.

118.    Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them.

119.    On January 20, 2010, Purdue's board was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

120.    Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

121.    Many of the historically highest prescribers of OxyContin – those same individuals that McKinsey urged Purdue to target for ever more prescriptions – had prescribed Purdue's OxyContin before the 2007 guilty plea and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

122.    McKinsey identified these physicians – those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers – as optimal targets for a massive marketing push to sell more OxyContin.

123.    McKinsey worked assiduously with Purdue over many years to continually refine this approach and required ever-more granular data for its analysis. More than three years after the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so that they could further analyze the individual amounts of OxyContin prescribed by individual physicians.

124.    At the same time, it requested this "prescriber-level milligram dosing data" from Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

125.    On July 23, 2013, Purdue's board discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline is "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

126.    In unveiling of *Project Turbocharge* to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

127.    McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

128.    By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by

refining and targeting the sales pitch to them. The Purdue board was kept apprised of McKinsey's progress.

### a. Titration – Selling Higher Doses of OxyContin.

129.    McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

130.    Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

131.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013 that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

132.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### b. Covered Persons – Sales Quotas and Incentive Compensation.

133.    McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

134.    Notably, this behavior was contemplated by the 2007 Corporate Integrity
Agreement, which required Purdue to implement written policies regarding "compensation
(including salaries and bonuses) for [sales representatives] engaged in promoting and selling
Purdue's products that are designed to ensure that financial incentives do not inappropriately
motivate such individuals to engage in the improper promotion or sales of Purdue's products."

135.    By 2010, Purdue had implemented a 4-year plan, consistent with McKinsey's
strategy, to dramatically increase the quota of required annual sales visits by Purdue sales
representatives to prescribers. The quota was 545,000 visits in 2010, 712,000 visits in 2011,
752,000 in 2012, and 744,000 visits in 2013.

136.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities
for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal
(e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO
and Board."

137.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to
the Purdue board in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the
focus of the sales force on the top prescribers, to also increase the overall quotas for sales visits for
individual sales representatives from 1,400 to 1,700 annually.

138.    In 2013, McKinsey identified one way that Purdue could squeeze more
productivity out of its sales force: by slashing *one third* of the time that Purdue devoted to
training its sales force (from 17.5 days per year to 11.5 days):



**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**

One possible route to benchmark

| Current call activity | | | Potential new allocation | | |
|---|---|---|---|---|---|
| Number of "on territory" days per year | | | Number of "on territory" days per year | | |
| Item | | Days[1] | Item | | Days[1] |
| Number of working days | | 260 | Number of working days | | 260 |
| Holidays | | -11.3 | Holidays | | -11.3 |
| Vacation and other time off | | -27.2 | Vacation and other time off | | -27.2 |
| Trainings and meetings | | -17.5 | Trainings and meetings | | -11.5 |
| Other company-related time off of field | | -4.3 | Other company-related time off of field | | -4.3 |
| Total days | | 199.7 | Total days | | 205.7 |
| Avg calls per day | x | 7 | Avg calls per day | x | 7.35 |
| Total calls per year | | 1398 | Total calls per year | | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis

McKinsey & Company | 59

139. By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physician calls per day out of its newly *less-trained* sales force.

140. Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales.

### c. Increasing the Overall Size of the Opioid Market: The Larger the Pie, the Larger the Slice.

141. Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended-release oxycodone."

Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to position a company so as to look like an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[35]

142.    Notably, this notion that the size of a company's market share is not as important as the size of the ***overall*** market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth,* McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete which market segments it participates in … the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[36]

143.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[37] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the Department of Health and Human Services.[38] McKinsey designed this plan.[39]

---

[35]    *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, available at: *https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c*.

[36]    *The granularity of growth*, Book Excerpt, McKinsey & Company, March 1, 2008, available at: *https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.*

[37]    *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, *available at*: *https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.*

[38]    *Id.*

[39]    Worth noting is that this strategy of increasing overall opioid sales directly benefitted the

**G.    Transformation: Purdue implements McKinsey's strategies.**

144.    As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

145.    Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

146.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

147.    On January 20, 2010, the Purdue board was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

---

Sacklers through their ownership of Rhodes Pharma. *See infra*. Especially worth noting is that this strategy also benefitted McKinsey's other opioid clients, such as Johnson and Johnson. *See infra*. "They have a huge amount of inside information, which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, Institutional Investor, July 8, 2019, *available at:* https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-*Written*. For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's *knowledge of the ways other pharma companies operate* suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

148.    This collaboration would continue over the course of the relationship between Purdue and McKinsey.

149.    During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue Pharma sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

150.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[40] (Purdue and its executives paid $634.5 million in fines).

151.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the Corporate Integrity Agreement: Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra

---

[40]    *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, available at: *https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c*.

one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[41]

### 1.    **Project Turbocharge**

152.    In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

153.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board to adopt it. Specifically, McKinsey urged the board to "make a clear go-no go to 'Turbocharge the Sales Engine.'"

154.    The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

155.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family – not the Purdue board of directors – in order to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Martin Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs… They were extremely supportive of the findings and our recommendations … and wanted to strongly endorse getting going on our recommendations."

156.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

---

[41]    *Id.*

157.    As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E: Evolve to Excellence."[42]

158.    Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

159.    CEO John Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

160.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Russell Gasdia during Purdue's implementation of McKinsey's recommendations.

161.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.  At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

162.    McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a ***doubling*** of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional

---

[42]    Regarding the name change, CEO John Stewart wrote to McKinsey partners Rob Rosiello and Arnab Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – *though we do need to find a better and more permanently appropriate name*." (emphasis added).

spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007

guilty plea is stark:



163.    At the time of McKinsey's first known work for Purdue, Purdue spent

approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project

Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue

exceeded $45 million per quarter, ***an increase of 800%***.

164.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On

January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in

order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[43]

165.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

166.    Purdue implemented McKinsey's suggestion.

## H.    McKinsey's efforts triple OxyContin sales.

167.    Purdue got what it wanted out of McKinsey. Between the years of 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

168.    These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

169.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO John Stewart informed Kathe Sackler and Vice President of Sales and Marketing Russell Gasdia Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these

---

[43]    In fact, recent deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony (emphasis added):

> Q: Are you familiar with McKinsey & Company?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
>
> Q: Did individuals at McKinsey *assist you in getting hired as the CEO* of Purdue?
>
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.

results were already being realized before the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

170.    McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: The Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of the Department of Health and Human Services entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue.

171.    In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[44]

172.    The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a tripling of revenue from OxyContin sales.[45]

173.    Under McKinsey's guidance, OxyContin would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[46] That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010.[47] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

---

[44]    *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, September 9, 2018, available at: *https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.*

[45]    *Id.*

[46]    Phil McCausland and Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC News, February 10, 2018, available at: *https://www.nbcnews.com/storyline/americas- heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.*

[47]    Gery P. Guy Jr, *at al.*, *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, Centers for Disease Control and Prevention, July 7, 29017, *available at: https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.*

174.    By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to two hundred people – the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

175.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

## I.    McKinsey Was Aware of the Devasting Effects of Opioids and Continued to Provide Marketing Advice.

176.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[48]

177.    Pearson stated, "At McKinsey pharmaceuticals was one of our biggest industry groups."[49] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was

---

[48]    John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, available at: *https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.* Notably, Rob Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to join Pearson at Valeant in 2015 as Chief Financial Officer.

[49]    Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Investor, September 3, 2014, available at: *https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the- pharmaceuticals-industry.*

loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[50]

178.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

179.    In 2012, while advising Purdue, McKinsey described its healthcare capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

180.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002 McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[51]

---

[50]    John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, available at: *https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a.*
[51]    Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big*

181.    As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue*.  What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:



**Findings on messaging and positioning**                    | PRELIMINARY

- Opioids overall are still viewed as effective and necessary class of painkillers, though side effects and addiction are concerns
- Key themes from prescriber interviews on abuse deterrents include:
  - Prescriber awareness of abuse deterrence and label change is mixed
  - Opinions on impact/efficacy of abuse deterrence vary
  - Most prescribers are concerned about abuse, but attempt to establish measures to protect themselves
  - Concerns remain that technology does not address oral abuse
  - Less informed prescribers ask for additional information and education around abuse deterrent formulations
- Existing market research suggests that most physicians do not feel that reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers

182.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

---

*pharma*, The Guardian, June 23, 2019, available at: *https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.*

183.    Indeed, one reason that Purdue had knowledge that their own products were addictive and dangerous is because McKinsey told them.

184.    In February 2009, only months prior to McKinsey's first known work for Purdue, Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled "The promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy," stated the matter plainly: ***Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed."*** (emphasis added). By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."[52]

185.    Further, Dr. Van Zee identified the *precise tactics* that McKinsey deployed for Purdue as a source of OxyContin misuse and abuse and suggested that regulation may be appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid prescribers – coupled with very lucrative incentives for sales representatives – would seem to fuel increased prescribing by some physicians – perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[53]

186.    Of course, to argue that McKinsey had contemporaneous knowledge of the fact that increasing OxyContin sales create ever more addiction and misuse in some ways misses the point. It disregards the context in which McKinsey was operating after 2009: advising a monoline manufacturer of opioids about sales and marketing practices for its addictive products while that manufacturer is bound by a 5-year Corporate Integrity Agreement covering the very same opioid

---

[52]    Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, American Journal of Public Health, February 2009, available at: *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.*
[53]    *Id.*

44

sales and marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[54] As late as 2018, it remained 84% of Purdue's revenue.[55]

187.   McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the *overprescribing of opioids* and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement; to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

188.   If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with Purdue. In June 2009, the earliest known work McKinsey performed for Purdue[56] consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

189.   Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

190.   McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association

---

[54]   Gerald Posner, *Pharma,* pg. 524 (Simon & Schuster 2020).

[55]   *Id.*

[56]   In a 2013 presentation to Purdue's CEO and VP of Sales and Marketing, McKinsey referenced McKinsey's "prior experiences serving Purdue that go back 10 years." Presentation by McKinsey to John Stewart and Russell Gasdia entitled *Identifying granular growth opportunities for OxyContin: First Board Update*, dated July 18, 2013, Pg. 2. While McKinsey's relationship with Purdue dates back to approximately 2003, the earliest known details of its work for Purdue date to June 2009. What McKinsey did for Purdue before 2009 is not presently known.

study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[57]

191.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

192.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[58]

193.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[59]

**J.    McKinsey Continued Consulting to Increase the Sale of Opioids Despite the Nationwide Epidemic.**

194.    Marvin Bower, a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[60]

---

[57]    Scott E. Hadland *et. al.*, *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related* Overdoses, JAMA Network, January 18, 2019, available at: *https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.*
[58]    *Id.*
[59]    *Id.* (emphasis added).
[60]    McDonald, *The Firm*, pg. 35.

195.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room – that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States – and delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

196.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

197.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

198.    Once again, in perfect McKinsey parlance,[61] these payments for future OxyContin overdoses were christened "Event-Based contracts."

---

[61]    "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, New York Times, November 27, 2020, available at: *https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.*



199.    Helpfully, McKinsey provided estimates for the future costs of these "events."[62] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

200.    A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs.

---

[62]    McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."



201.    The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

202.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Martin Elling raised this concern with Arnab Ghatak and suggested corrective action: destroying evidence.

Message
From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:       7/4/2018 12:10:13 PM
To:         A G [drarnabghatak@gmail.com]
Subject:    Re: [EXT]Re: Howdy

Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that ==eliminating all our documents and emails==.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +===============================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +===============================================+

203.    Elling's prediction that things would "get tougher" for Purdue proved
prescient.

### 1.    Purdue Pleads Guilty—Once Again.

204.    On October 20, 2020, Purdue – McKinsey's co-conspirator – agreed with the
United States Department of Justice to plead guilty to improper marketing of OxyContin and other
opioids again. This time the plea agreement concerned conduct from 2010 to 2018.

205.    Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United
States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, 353, among other
charges, relating to its opioid sales and marketing practices after the 2007 guilty plea.

206.    The new plea agreement does not identify Purdue's co-conspirators, and
McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the
"consulting company."

207.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

208.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

209.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO") (emphasis added).

**2.    McKinsey's public *mea culpa*.**

210.    On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

> **McKinsey statement on its past work with Purdue Pharma**
>
> December 5, 2020—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential

deletion of documents. We continue to cooperate fully with the
authorities investigating these matters.[63]

211.    As the statement indicates, McKinsey stopped doing work "anywhere in the

world." Given that Purdue's operations addressed only the United States, the global reach of

McKinsey's regret is noteworthy.

212.    In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge"

for Purdue, Tim Reiner, a long-time McKinsey consultant, joined Mundipharma. Mundipharma

is a separate company – also owned by the Sacklers – that sells opioids internationally.

213.    He is currently the Sacklers' "Chief Business Officer" at Mundipharma. As late as

2019, Mundipharma has been asserting many of the same misleading claims about opioids that

previously led to criminal liability in the United States.[64]

214.    "It's right out of the playbook of Big Tobacco. As the United States takes steps to

limit sales here, the company goes abroad," stated former commissioner of the U.S. Food and

Drug Administration, David Kessler.[65]

## CLASS ALLEGATIONS

A.    **Class Definition.**

215.    Plaintiffs bring this case on behalf of themselves and as a class action under CR 23

on behalf of all members of the following Class:  All Indiana local governmental entities for the

period 2004 to the present.

---

[63]    *https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-
purdue-pharma#.*
[64]    Kinetz, Erika, *Fake doctors, pilfered medical records drive OxyChina sales*, Assoc. Press,
Nov. 19, 2019, available at: *https://apnews.com/article/4122af46fdba42119ae3db30aa13537c.*
[65]    Harriet Ryan, Lisa Girion, and Scott Glover, *OxyContin goes global – "We're only just
getting started,"* Los Angeles Times, December 18, 2016, available at:
*https://www.latimes.com/projects/la-me- oxycontin-part3/.*

216.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity where and as necessary, including to conform to the evidence, for purposes of resolution or settlement.

**B.    Class Requirements.**

217.    The putative classes are sufficiently numerous—including inter alia 92 county governments, 569 city governments, and 1,006 town governments—such that joinder of each absent class member would be both impracticable and inefficient.

218.    There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Defendant's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue Pharma before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin;

b.    Whether Defendant performed reasonable due diligence in ascertaining the risks associated with Defendant's strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

c.    Whether Defendant's implementation of its own sales and marketing strategies at its Client, Purdue, caused or contributed to an increase in opioid addiction;

d.    Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue was negligent, grossly negligent, or reckless;

     e.      Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue caused or contributed to causing a public nuisance;

     f.      Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue constituted fraudulent misrepresentations to healthcare providers regarding the safety of Purdue's opioid products;

     g.      Whether Defendant conspired with or aided and abetted Purdue with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue; and

     h.      Whether Defendant's acceptance of funds from Purdue and other opioid manufacturers regarding Defendant's work promulgating and implementing nationwide opioid sales and marketing strategies constitutes unjust enrichment.

219.    Plaintiffs' claims are typical to the claims of the Class. Plaintiffs and all Class Members were exposed to undeviating behavior and sustained damages arising out of and caused by Defendant's unlawful conduct.

220.    Plaintiffs' interests are directly aligned with the absent Class members and, as such, Plaintiffs will fairly and adequately represent and protect the interests of the absent Class members.  Plaintiffs have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the putative class.  Further, Plaintiffs are unaware of any conflicts between Plaintiffs and the absent Class members.

221.    Plaintiffs have, or can acquire as necessary, sufficient financial and legal resources to assure that the interests of the Class members will be protected. Further, Plaintiffs

are knowledgeable concerning the subject matter of this action and have, and will, assist class counsel as necessary in the prosecution of this matter.

222.    The prosecution of Plaintiffs' claims on an *ad hoc* basis would create a substantial risk of inconsistent and/or varying legal outcomes that would establish incompatible standards of conduct.  Class certification would alleviate these issues and provide for an orderly, timely, and efficient resolution for each Class member as well as the Court.

223.    The prosecution of Plaintiffs' class claims on an individual *ad hoc* basis is inappropriate where Defendant has admittedly acted in such a manner that final declaratory and injunctive relief is both necessary and required.  Similarly, *ad hoc* litigation is inappropriate where declaratory and injunctive relief is warranted to the Class members as whole.

224.    Given the putative class is comprised solely of Indiana local governmental entities, the class action procedural mechanism is appropriate and provides a superior means of resolution.

## CLAIMS FOR RELIEF

A.    **Negligence.**

225.    McKinsey, through its work with Purdue, owed a duty of care to the Plaintiffs and the Class, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

226.    In violation of this duty, for years McKinsey devised and assisted Purdue with implementing a sales and marketing campaign, including *Project Turbocharge*, that would dramatically increase the amount of OxyContin prescribed and distributed throughout Plaintiffs' and the Class' communities.  In the process, McKinsey continually devised misleading claims

regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

227.    As a direct and proximate result of McKinsey's negligent conduct, Plaintiffs and the Class have suffered and will continue to suffer harm.

**B.      Negligent Misrepresentation.**

228.    McKinsey, in the course of its business with Purdue, failed to exercise reasonable care or competence when obtaining and communicating false information regarding Purdue's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including the healthcare providers within Plaintiffs' and the Class Member's communities who were capable of prescribing Purdue's drugs.

229.    Plaintiffs' and the Class' communities are among the limited group of entities to whom McKinsey knew Purdue intended to supply the false information regarding opioids.

230.    McKinsey knew that the false information was material to healthcare providers' decision to prescribe opioids to patients. McKinsey intended that such statements be relied upon to encourage additional opioid prescriptions.

231.    As a proximate result of McKinsey's negligent conduct, Plaintiffs and the Class have incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids.  Plaintiffs and the Class have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, and to allocate limited resources to combat the devasting social effects of the opioid epidemic.

**C.      Public Nuisance.**

232.    Plaintiffs bring this claim against McKinsey under Indiana common law which confers upon Plaintiffs the counties the power to suppress all nuisances that are or may be

injurious to the health and welfare of their respective communities.  Plaintiffs further seek to recover costs associated with the nuisance and its abatement.

233.    McKinsey, though its work with Purdue and other opioid industry participants, have created and continue to perpetuate and maintain a public nuisance throughout the Plaintiffs' and the Class' communities through the massive distribution of millions of doses of highly addictive, commonly abused prescription pain killers known as opioids.

234.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, have fueled an opioid epidemic within the Plaintiffs' and the Class' communities that constitutes a public nuisance. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, towns, and communities. McKinsey's annoyance, injury, and danger to the comfort, repose, health, and safety of Plaintiffs' and the Class' communities includes, inter alia:

a.    in 2009, the first known year in which McKinsey advised Purdue regarding sales and marketing efforts for OxyContin, there were 769 opioid-related overdose deaths in Plaintiffs' and the Class' communities. McKinsey crafted a strategy that tripled OxyContin sales in subsequent years;

b.    in 2014, the year McKinsey's Project Turbocharge was implemented, 1,077 Kentuckians died as a result of an opioid-related overdose;

c.    from 2004 to 2014, Indiana's drug overdose mortality rate effectively doubled. Prescription opioids contributed to the majority of those deaths. The following year, McKinsey developed "Project Turbocharge," which was adopted as the national sales theme for the following year, under the rubric of "Evolve to Excellence";

d.    prescription opioid addiction often leads to illicit opioid use and addiction;

       e.      according to the Centers for Disease Control, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

       f.      Indiana hospitals are reporting increasing numbers of newborns testing positive for prescription medications; and

       g.      McKinsey's crafted deceptive marketing strategies that were prepared for Purdue, purchased by Purdue, and implemented by Purdue with McKinsey's ongoing assistance. These strategies enflamed, purposefully, an opioid abuse and addiction epidemic that has caused Plaintiffs' and the Class' communities to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

235.    Plaintiffs and the Class seek to abate the public nuisance McKinsey enflamed and all necessary relief to abate such public nuisance.

**D.    Fraud (Actual and Constructive) and Deceit**

236.    McKinsey made and caused to be made false representations to healthcare providers working in Plaintiffs' and the Class' communities, and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

       a.      downplayed the substantial risks of addiction and other side-effects of opioids, generally, and Purdue's opioids, specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring

additional administration of opioids, and omitting the high risks of addiction actually present;

       b.     overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

       c.     misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare providers.

237.    McKinsey and Purdue's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plan used by Purdue to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

238.    McKinsey intended healthcare providers to rely upon McKinsey's false assertions regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically, to increase the number of opioid prescriptions made by healthcare providers.

239.    Healthcare providers working in Plaintiffs' and the Class' communities did in fact rely on the false representations made in Purdue's marketing plan created by McKinsey and implemented with McKinsey's assistance.

240.    Plaintiffs and the Class seek to recover all damages caused by McKinsey's fraudulent representations and omissions.

241.    McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others. As such, Plaintiffs and the Class seek to recover punitive damages against McKinsey.

## E.    Civil Conspiracy.

242.    McKinsey and Purdue, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

243.    McKinsey and Purdue agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin to health care providers within Plaintiffs' and the Class' communities.

244.    McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

245.    McKinsey and Purdue conspired to violate Indiana law, including but not limited to Indiana's opioid marketing, sales, and distribution requirements as well as Indiana's consumer protection laws.

246.    McKinsey and Purdue engaged in deceptive trade practices including making and causing to be made misrepresentations and omissions in marketing of opioids in general, and

Purdue's opioids, specifically, that deceived or could reasonably be expected to deceive or mislead consumers.

247.    McKinsey and Purdue engaged in unfair trade practices, including intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

248.    McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically.

249.    McKinsey, a majority of the Purdue board, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely held company.

250.    As a consequence, McKinsey is responsible, liable, and accountable for the improper sales and marketing practices used to promote Purdue's opioid products including OxyContin.

251.    As a proximate result of McKinsey's improper conduct, Plaintiffs and the Class were damaged and entitled to seek all available relief.

**F.    Negligence Per Se.**

252.    McKinsey's actions as detailed herein, demonstrate that McKinsey unlawfully, unfairly and unconscionably worked with certain of its opioid manufacturing clients, including

*inter alia* Purdue, to aggressively promote and sell more opioids to more Indiana patients for longer periods of time.

253.    McKinsey's actions—its acts and practices—are in direct violation of multiple Indiana statutes and regulations that has resulted in injury to Plaintiffs and the Class, including *inter alia*, Indiana's controls over the unlawful marketing and sale of opioids.

254.    On or about February 4, 2021, solely on behalf of the State of Indiana and not the Plaintiffs and the Class, the Attorney General filed a complaint seeking a permanent injunction against McKinsey relating to its unlawful marketing and sale of opioids.  That same day, McKinsey consented to judgment being entered against it as to the State of Indiana's claims.

255.    As a proximate result of McKinsey's negligent conduct, Plaintiffs and the Class have incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids.  Plaintiffs and the Class have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, and to allocate limited resources to combat the devasting social effects of the opioid epidemic.

256.    Plaintiffs and the Class seek to recover all damages caused by McKinsey's *negligence per se* unlawful marketing and sale of opioids.

## G.    Deceptive Advertising.

257.    McKinsey's actions as detailed herein, demonstrate that McKinsey unlawfully, unfairly and unconscionably engaged in the deceptive advertising—marketing—of opioids.

258.    As a proximate result of McKinsey's knowing and willful deceptive conduct, Plaintiffs and the Class have incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids.  Plaintiffs and the Class have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment

facilities, law enforcement services, and to allocate limited resources to combat the devasting social effects of the opioid epidemic.

259.    Plaintiffs and the Class seek to recover all damages caused by McKinsey's deceptive marketing and sale of opioids.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class respectfully pray that the Court grant the following relief:

260.    The Court certify their respective Class claims as an Indiana class action, name Plaintiffs as Lead Plaintiffs of their respective class, and appoint Plaintiffs' undersigned counsel as Class Counsel.

261.    Enter judgment in favor of the certified Class and against McKinsey.

262.    Award Plaintiffs and the Class all available compensatory, equitable, injunctive, declaratory, and punitive damages, against McKinsey including *inter alia,* (i) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths, (ii) costs for providing treatment, counseling and rehabilitation services, (iii) costs for providing treatment of infants born with opioid-related medical conditions, (iv) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation, (v) costs associated with law enforcement and public safety relating to the opioid epidemic, and (vi) costs associated with drug court and other resources expended through the judicial system.

263.    Order McKinsey to compensate Plaintiffs and the Class for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic in their communities.

264.    Order McKinsey to fully fund an abatement fund for the purpose of abating the public nuisance in Plaintiffs' and the Class' communities, including providing educational and

social supporting services.

265.    Award Plaintiffs and the Class their attorneys' fees, costs, expenses, pre- and

post-judgment interest.

266.    Award Plaintiffs and the Class all other relief as provided by law and/or as the

Court deems appropriate and just.

267.    A jury on all issues so triable.

\* \* \* \* \* \* \* \* \*

Dated: March 29, 2021                        s/ Michael D. Grabhorn

**Bahe Cook Cantley & Nefzger PLC**            **Grabhorn Law | Insured Rights®**

William D. Nefzger, *pro hac motion to*        Michael D. Grabhorn
*be filed*                                     *m.grabhorn@grabhornlaw.com*
*will@bccnlaw.com*                             Andrew M. Grabhorn
1041 Goss Avenue                               *a.grabhorn@grabhornlaw.com*
Louisville, KY 40217                           2525 Nelson Miller Parkway, Suite 107
p (502) 587-2002                               Louisville, KY 40223
f (502) 587-2006                               p (502) 244-9331
                                               f (502) 244-9334

**Blanton & Pierce, LLC**

Kenneth C. Pierce, II
*kpierce@blantonpierce.com*
705 Meigs Avenue
Jeffersonville, IN 47130
p (812) 283-8577
f (812) 283-7995

*Counsel for Plaintiffs and the Putative Class*